25-1830, Amanda Brooks v. Bright Horizons Family Solutions, NL. Good morning, Stephen Bernstein, voting plaintiff appellant.  The key to this case, this is a Rule 12 dismissal case, the key to this case is the relationship between the plaintiff and her supervisor, Robin Carone. Plaintiff was Carone's only black director under Carone's supervision. Even prior to the promotion denial in this case, Carone subjected the plaintiff to a series of hostile and irrational supervisory actions sufficient to survive a Rule 12 motion to dismiss. Under this case, this court's rulings, and Littlejohn, Vega, and Down, and others, we don't have to make that a comment based case, but we do have evidence committing an inference of discriminatory intent. Some of those acts of pre-promotion denial of disparate treatment include micromanagement and telling the plaintiff, even though she doesn't know her, that she doesn't trust her and she's going to be more harsh than her prior supervisor. But moving beyond that, which is relevant, but moving to one of the main concrete adverse actions in the case is the promotion denial. The same woman who had been treating plaintiff with hostility from the outset of the supervisor-employee relationship denies plaintiff a promotion, even though plaintiff was qualified based on the allegation. Can we just break this down because I know there are a number of different causes of action, and I just want to make sure analytically I'm following you. With respect to the denial of promotion claim, you've got Title VII, but you also have your 1981 with different limitations periods, right? Yes. So with Title VII, the failure to promote came before, outside the limitations period, right? That's right. But you do fall within the limitations period for 1981 claims for promotion, right? Correct. So is that what you're talking about here with respect to the 1981 claim? Yes. Yes, on the promotion denial. I just wanted to frame things here. The termination claim falls within the Title VII by one or two days. So the promotion denial is one of the key concrete adverse actions here, and plaintiff was obviously qualified based on the allegations and the complaints she had a successful tenure in this role. But she was denied the position, and the one who got it was non-black, outside plaintiff, protected class, did not have the qualifications under the job description. He didn't have supervisory experience. And Sorone, Corone tells the plaintiff, you didn't get the position because you lacked experience managing people not like you. And I'm sorry, just to help me follow along in your complaint, and I think I'm following you, just point us to the paragraphs where you allege that the person who did get the promotion was not equally qualified, or was less qualified, rather. That's paragraph 89-91. Lopez did not have supervisory experience necessary for the position, and plaintiff did, obviously. So that helps with the promulgation case to the extent we have to assert that. But more importantly, we know what Sorone said to the plaintiff about why she didn't get the position. You don't have enough experience managing people not like you. What does that mean? Under this court's cases, drawing the inferences favorable to the plaintiff, that is a racial comment. Plaintiff doesn't have enough experience managing white subordinates. Plaintiff said, what are you talking about? And Sorone digs herself deeper into a hole and makes reference to two of plaintiff's subordinates, an Asian subordinate by the name of Bai, and a Latina subordinate by the name of Irizarry. And this only further supports plaintiff's claim, because those two examples, they're not white. And plaintiff had nothing to do with anything going on with them that was negative. In fact, plaintiff told Sorone that Bai complained that Sorone was discriminating against Bai, yielding a dismissive response from Sorone, and prompting Bai's resignation. So how does the justification that Sorone offered allow the district court to dismiss the case under Rule 12 as a problem? It's as close to direct evidence as you can see. Any HR department would be horrified to hear something like this being uttered in the workplace. But again, we're at Rule 12. This is an issue for discovery. So then we get to plaintiff's termination. And Sorone, again, is part of the termination decision. Plaintiff is fired not long after she complains about discrimination in the workplace. Plaintiff reported Bai's discrimination complaints to Sorone on multiple occasions throughout 2021, ending in October. And in December, November, December, plaintiff is fired. That's only two months later. So when you consider the comment relating to the promotion uttered by Sorone, and then plaintiff— Can I just jump in a second? You said that the comments about Bai were in—I guess it was arranged from April to October, but she wasn't fired until March, right? Correct. Correct. The promotion denial was December. It was late 2021, shortly after plaintiff reported Bai's discrimination comments. The termination was in March, but Sorone orchestrated the termination. So under cases like Bart versus Gala, Bickerstaff, when the discriminator— If I could just jump in for a second. Is there a concern about the time between the reporting the comments about Bai, which let's say they went up until November, and then she was terminated in March of 2022? I agree with the assertion in your brief that there's not a fixed, you know, this many months is too long or this is too short. But what is the connecting—what do you see in the record to support the connection between those incidents and the termination in March? Well, we have timing. Plaintiff reported Bai's discrimination complaints to Sorone from April to October 2021. And the following March, about four or five months later, plaintiff is terminated for false reasons relating to her alleged lack of compliance with COVID protocol. The timing is four or five months is within this court's framework for retaliation. And we cite cases in the brief to that effect. And even apart from timing, the fact that Sorone orchestrated plaintiff's termination, and Sorone is the one who made the racial comments in connection with the prior promotion decision, that's a problem for the defendant on a motion like this. And under Littlejohn, Vega, as well as Bart and Bickerstaff and all the cases involving discriminatory link in the employment relationship resulting in terminations, when a person makes a comment like Sorone did, who ultimately fires plaintiff for a false reason, then you can infer that the discrimination motivated or caused the termination decision. Thank you. Okay. Thank you very much. You can preserve three minutes for rebuttal. Why don't we hear from counsel for the affidavit. We have Mr. Friedberg. Good morning, your honors, and may it please the court. My name is Ailey Friedberg, and I'm counsel for the appellee's Bright Horizons Family Solutions and related entities. The district court correctly dismissed this case because the amended complaint never crosses the line from speculation to plausibility. The appeal tried to repackage conjecture as a mosaic, but the tiles that make up the narrative as asserted in the amended complaint don't fit together into a complete puzzle that creates a plausible claim upon which race and gender discrimination or retaliation can be sustained. The appellate asserts three basic theories, and each one of them are defective. The first is a discrimination claim based on disparate treatment that is premised on the treatment of alleged comparators. But the allegations in the amended complaint don't provide really any details, certainly any material details, about the comparator's qualifications or how those comparators were treated. And, in fact— Does the complaint say that the comparator had less experience? It would only on one occasion, Your Honor, with respect to the position that Ms. Brooks applied for. But with respect to that, that's the only description. The case law that we cited throughout the brief clearly says that when a discrimination claim is based on disparate treatment, the allegations in the complaint must demonstrate that the comparators are entirely, in all aspects, equal to the plaintiff. And that's required at the 12B6 stage? Yes, that is a pleading requirement to sustain disparate treatment. Does it mean that there has to be a listing of all of the ways in which the comparator is comparable? Do you have the same experience? Do you have the same salary? Do you have cases that say that level of detail is required at the 12B6 stage? I certainly would posit so. For example, the Ferrucchi case, the Ferrucchi v. Health and Hospitals case, which the court decided, stated that to sustain a discrimination claim based on disparate treatment, the complaint itself must plead that the comparators are similarly situated in all respects. Similarly, in the Bowdoin v. Brightworks case, Judge Daniel Meyer also echoed the same language. The allegations in the complaint must plead that the comparators are similar in all respects. And here, the only allegation, again, is that the individual who was awarded the position didn't have supervisory experience. There's no allegation about the tenure, any other qualifications that Mr. Lopez may have had that made him eligible, or that made him an adequate comparator to Ms. Brooks. What do you do if you could turn to the following paragraph, 91, where the allegation is that Ms. Carone told Ms. Brooks that one of the reasons she didn't get the job is because she needs more experience managing people who were, quote, not like her. And the two people who were used as examples differed from her by virtue of race. So maybe that's not what Ms. Carone meant. Maybe she meant personality types. But at the pleading stage, why is that not an adequate allegation that her race, meaning that she was not like the people she was supervising, was, quote, one of the reasons she didn't get the position? Totally fair question, Your Honor. And my response to that would be there's an irony here with the opponent's argument about the mosaic theory in general. And it's something, frankly, we agree with. You have to read the allegations in the complaint holistically. And when you read that statement in a vacuum, maybe there is a possibility that you have competing inferences. However, when you read the allegations, not just paragraph 91. But if they're competing inferences at this stage, aren't we supposed to make the inference that favors the plaintiff? That's exactly the point, Your Honor. And again, that is a fair question. And generally, yes, without a doubt, if there is concrete factual allegations that could result in competing inferences, a motion to dismiss should be denied. However, when you read the amended complaint holistically, you understand the context in which that statement was uttered. And there is no competing inference. Okay, so tell us why the racially tinged inference is wholly unreasonable. Because I think that would be the standard, right? Any reasonable inference has to be drawn in favor of the plaintiff. You now have to demonstrate why that is wholly unreasonable. No reasonable person could read it that way. What is the context that would get you there? Sure, Your Honor. And I do want to make clear that we do dispute that the phrase, people not like you, does have an inference. Maybe it's all a lie, but we're not there. So just give me the context in the complaint that in your view makes the notion that this is a racially charged comment wholly unreasonable. No reasonable person could possibly read it that way. Tell us what that context is. Because in the preceding paragraphs, and frankly earlier in the complaint, the appellant describes their interactions both with Ms. Irizarry and with Ms. Bay. And also describes Ms. Carone's interpretation of that. And clearly the allegations within the complaint indicate that Ms. Carone felt that this was a mismanagement, that there was some personality conflict. No allegation in the complaint indicating at all whatsoever that the conflict between Ms. Brooks and Ms. Irizarry and or Ms. Bay had to do with race or gender or any other protected characteristic. But that there was some sort of personality conflict that caused those two individuals to request to leave and to request transfers to other locations that Ms. Brooks wasn't managing. And in that context, which plaintiff, and this is plaintiff's own plea, she did not mean to include that context, but she did. And I think as a result, this report is obligated, again, the Mosaic theory of the complaint, what's good for the goose, what's good for the gander, needs to be read here. And with that context that the appellant herself provided, there is no possible competing interpretation. Can I just throw some of the other allegations that are part of the Mosaic? Carone demanded to be copied on every email Brooks sent, no matter how routine or mundane, and to be invited to each of her staff meetings, and did not impose such requirements on other non-Black directors. She accused Brooks of going rogue by talking to the COVID team, even though that was a responsibility. She did not so limit non-Black directors. She met individually with Brooks' direct reports and asked if they had issues with Brooks. She did not do that with non-Black directors. Investigated an alleged COVID protocol breach, but didn't investigate the white woman who was the director of the center where the breach reportedly happened. Aren't all of those comparators and aren't all of those, if not individually, collectively, enough to constitute minimal evidence suggesting an inference that the employer has acted with discriminatory motivation? I would respect to suggest no, Your Honor. And the reason, again, harkens back to the pleading requirement that the comparators need to be described in far more detail, in any detail, because there is none here, other than the allegation that the comparators are not Black. Didn't Littlejohn suggest that the mere fact that you've been replaced by somebody or not hired in place of somebody, we've got two different stages here, a course of events here, by somebody who's not in the protected place, that alone is probably enough to raise a minimal inference. Put aside all these other allegations. Why isn't this resolved by Littlejohn? So, replacement with an individual who's not, who's a member of a different class of protected category of employee is not in and of itself dispositive of, or sufficient enough, rather, to state a claim for race discrimination. And I can cite another secondary case, Francino, that we cited in our brief, that again, this is something, that is a factor that needs to be reviewed holistically, again, harkening back to the mosaic idea. You need to review the allegations of complaint. The allegations of complaint here are premised on neutral, non-discriminatory statements and comparators who, we don't know whether they are comparators. Well, that's why we have similar judgment, right? That's why we develop the evidence and we say, well, maybe there was a reason for her incredibly close monitoring of the plaintiff here that didn't apply to all of the others. But is it your position that that all has to somehow be built into the complaint? Absolutely, Your Honor. There is, this is an interesting case, to me, for a reason, because if black letter law, conclusory allegations are not entitled to any deference, right? Okay, but it's not a conclusory violation to say very specifically she demanded to be copied on every email and didn't demand. I understand an allegation like, oh, she treated them more nicely. I understand those are mushy. But when you get into very specific policies directed at the plaintiff that weren't directed at her non-black peers who were in the same job level, I'm struggling with why that's not enough. It's not enough because there's nothing within the complaint to show that this treatment was based on a protected characteristic such as race or gender. There's, for example, the allegation of micromanagement that could be simply a situation where you have a boss who is very detail-oriented, or frankly, who may not be a good boss. And again, not wanting to create issues of fact here, this is an allegation that is built into the appellant's own complaint. And you can see that in the allegations concerning Mrs. Bay's complaints towards Ms. Carone. There's about 10 paragraphs, approximately, within the complaint where the appellant describes that Ms. Bay, a non-black supervisor who is a comparator, is complaining about the same exact behavior that is the premise for the discrimination plans that plaintiff has asserted. What are we to make of the fact that Ms. Bay also attributes the behavior to discrimination? I mean, obviously, she's not black. She's Asian-American. But I'm not sure that helps to say, like, whoa, this was just a difficult boss to point to the fact that it wasn't just a black employee who had a problem. Here was another, an Asian employee who had a problem, but who also attributed it to race. I'm not sure that helps you there. Respect to you, Your Honor, I think it does, because it shows that this is a behavior top-down from a boss to her subordinates that is consistent across individuals of multiple races. No, we haven't heard claims that she treated her white subordinates that way. Well, that's not the allegation in the complaint. The allegation is specifically she treated black subordinates worse. Not that she treated all subordinates worse. It is the fact that she did it, and frankly, the allegation in the complaint is only related to black people. I'm just saying that she treated every other comparator better. But then there's a direct conflict within the board. So wait a minute. Are you saying that it undermines her claim that she also behaved in a biased manner toward other non-white employees? I wouldn't call it bias at all. I'd call it... No, no, but I think the argument that you're just making is, it seems to... I thought you were just suggesting that she's alleged that everybody other than black women are treated better. And the fact that they had concerns, therefore, somehow undermines that claim. I'm just wondering if it's possible that she could also be discriminatory toward Asian Americans. That's not the allegation we're facing in the complaint. The allegation that we're facing in the complaint is that she treats specifically black women worse, and she doesn't. Okay, I think we've kept you up past your time. Unless there are any further questions from the panel, though, I think we have your argument. Thank you very much. Thank you. I want to hear from counsel to the appellate three minutes for rebuttal. I have three major points. First, the argument that we don't clearly lay out the details of who is similarly situated with the plaintiff. The plaintiff alleges that she was comparing her treatment to that of other directors, that that's plaintiff type 2. And the comparison treatment in paragraphs 58, 64, there is detail about Carone did A, B, and C to me, didn't do it to them. In Bound, two years ago, this court said in footnote 7, don't overanalyze disparate treatment comparator allegations on a Rule 12 motion to dismiss. That's not the place for that. The place for that is summary judgment. The plaintiff's claim that Carone did not micromanage the non-black directors, that's in the complaint at paragraph 60 to 63. So that's my first point. Number two, the context of the not like you admission, whether it's a personality conflict, whether it's a racial inference, reasonable competing inferences cannot be resolved under Rule 12. And bear in mind that when plaintiff asked Carone what she meant by this, and Carone mentioned B as one of the examples, B, Carone was put off when plaintiff reported what B had said about Carone's discriminatory treatment. So one of the claims is Carone didn't want to hear it. You know, I don't want to hear this from one of my subordinates. You don't have enough experience managing white people. Third, the fourth element of the primary patient case, this is very interesting. The district court said being replaced or denied a promotion in favor of somebody outside the protected class is not enough to make out a claim under Rule 12. This court has always held that. This court has held that since at least the 1980s. The cases in defendant's briefs are all unpublished Second Circuit decisions where the plaintiff loses because the complaint otherwise completely undermines the discrimination complaint. But there's no published opinion from this court that says that it's not a primary patient case, even if the plaintiff alleges she was replaced by somebody outside the protected class. So until that happens, that alone makes that a primary patient case. But we know you don't even have to allege a primary patient case to make out a claim under Rule 12. Thank you. Thank you to both counsel. We appreciate your arguments today. We will take the case under advisement. Turning to the third case on today's calendar, 25-2652. Controllers to Venezuela say N-L versus N-U-F-G Union Bank. N-A and L. Good morning. We understand, Mr. Godley, so the counsel for the appellant to understand you're going to split argument half and half. Is that right? That's correct, Your Honor. And Mr. Godley goes first, and then Mr. Timotheo goes next. And then for the appellee, we will split argument half and half. And you've got it all? I know. All right. Well, I hope you brought a bottle of water. We will then allow each of the appellant's lawyers to have two minutes apiece for rebuttal. But we are just warning you, just because you're splitting it in the aggregate, you're not going to, as a practical matter, get any more than the other side. So you're going to need to be attentive to the clock there. Before we do actually start the arguing and before we run the clock, would you just articulate for the courts and we keep track which issues each of you has divvied up so we know the order of events? Sure thing. I will be handling the comedy and active state issues, and Mr. Timotheo will be handling the merits of defendant's loan law issues. Okay, very good. Thank you. You may proceed whenever you're ready. Thank you, Your Honor, and may it please the Court. Thank you, Your Honor, and I'm here with Mike Gottlieb representing Appellant PDV Holding. Articles 150 and 187.9 of the Venezuelan Constitution hold that any national public interest contract must be approved by the Venezuelan National Assembly. The party's dispute boils down to whether the National Assembly's approval authority covers contracts executed by PDVSA, Venezuela's state-owned national oil company, or whether that approval authority is limited to only contracts in which the national executive is a party. Over half a decade of litigation, the Republic has made five submissions in U.S. courts, offering a patient, clear, thorough, and authoritative interpretation of Venezuelan law. Like the Chinese Ministry of Commerce in the Vitamin C litigation, the Republic has explained a feature of Venezuela's Constitution that may not be obvious to U.S. courts. In Venezuela's constitutional system, PDVSA is more than just a state-owned entity. PDVSA's responsibility over the lifeblood of Venezuela's economy means that many PDVSA's contracts directly implicate Venezuela's national economic interests. That interpretation is rooted in practice. For decades, the National Assembly has reviewed and approved PDVSA contracts under Article 150 and 187.9, even where the national executive is not a party. The district court rejected the Republic's interpretation of its own Constitution. I'm just trying to ask a question on that. Are there examples prior to 2017 of the National Assembly being asked to approve contracts pursuant to which PDVSA committed itself to substantial debt? So, the debt contracts, there would not be an example of that for two reasons. There are examples prior to 2017 of PDVSA contracts being submitted to the National Assembly for approval by the national executive. Those are cited in Brewer's supplemental report, which is at pages 3595-97 of the special appendix. With respect to the debt contracts, the reason that there wouldn't have been is because prior to this transaction, and this is explained in Ambassador Vecchio's letter and in the Republic's briefs, but prior to this transaction, PDVSA had never attempted to encumber a foreign asset as collateral in the issuance of a debt agreement, and many of the debt agreements would not have been subject to the constitutional restriction in Article 150 anyway, because they wouldn't have been contracts with foreign counterparties or with foreign states. Well, but some of them were, and so I'm thinking through the significance of providing security. Certainly, if PDVSA got out over its skis on debt, its foreign-held assets would be vulnerable to collection, regardless of whether they had been specifically pledged. It interposed a few more steps for the creditors to collect it, but am I wrong about that? That doesn't necessarily mean that the contract would implicate provision in Article 150 to qualify as a national public interest contract, and I think part of the issue here is first that we are now splitting hairs over the scenarios in which the National Assembly chooses to assert its powers over a contract. There's no question that, in this case, the National Assembly did choose to assert its approval authority over the contract, and the way we get into an active state doctrine problem is by starting to ask, well, did the National Assembly apply that approval authority consistently over time? Do we feel like they've adopted a consistent practice? So let me, and maybe I'm misunderstanding sort of how the two issues relate to one another, and this is helpful to understand because when you said you were going to argue active state, and then it seemed like you started on the underlying question of whether approval is required. If approval isn't required, isn't that the scenario in which we get to your active state argument? Or is your active state argument that if approval is required, then the active state doctrine sort of tells us that the approval is denied, and if approval is not required, you lose all around? Is that sort of where we land? I think the court should begin with the active state question because the active state question asks, is there an act of the sovereign that supplies a rule of decision in this case? Didn't we kind of suggest last time around that maybe it should be flipped, that before we resort to the active state, we should figure out what the governing law is and whether or not approval of the National Assembly was required for this contract? This court can, of course, take the issues in whichever order it chooses. Under the Celestin's case and under Sabatino and cases like it, what the active state doctrine does is it supplies a rule of decision for the case. And so if you're looking to see is there a rule of decision that we apply to the question of, were the bonds valid when issued, which is the issue that the district court was supposed to consider on remand from the New York Court of Appeals. Were these bonds valid as a matter of Venezuelan law when issued? If there is a rule of decision that applies to it, there's no need for this court to wade into the merits of Venezuelan law at all because the rule of decision is supplied, by the sovereign acts under cases like Celestin and under cases like Sabatino. But how do we understand the significance of what the National Assembly did if we don't understand what the legal framework is and what authority it didn't have under sort of underlying Venezuelan law? I guess I'm struggling with that. So under a long line of cases, the relevant question under the active state doctrine is, what was the sovereign purporting to do? That's the language that this court quoted in its 2022 certification opinion. That's from Celestin. That's from Kirkpatrick and other cases that follow it. Don't ask, what did the foreign sovereign legally accomplish? You ask, what were they trying to do? What were they claiming to do? This court has already essentially recognized what the National Assembly was purporting to do. What were they purporting to do? They were purporting, according to this court's certification opinion in 2022, which we agree with, they were purporting to assert their constitutional authority over the exchange, and they were rejecting the pledge and rejecting the transaction in the course of asserting its constitutional authority over the exchange. So your argument is, if that's what they were purporting to do, then it doesn't matter whether in fact they had such constitutional authority because their assertion of that authority under the active state doctrine creates the authority. Is that what I'm understanding? It's more than that, Your Honor. It's not just that. It's that once you understand what they were purporting to do or what authority they were asserting, you cannot examine whether that was consistent with Venezuelan law. That is the precise holding of Banco de España. That is the precise holding of Sabatino. And that is exactly the point of the active state doctrine. When it is made to appear that the foreign sovereign has acted in a certain capacity, that's the language from Racaute, when it is made to appear that the sovereign has acted in a certain capacity, you don't then ask, well, did they comply with all of the requirements of their own country's constitution? In Banco de España, for example, it was a secret decree that the ambassador from Spain provided to the United States court. The court didn't ask the question, did that decree get promulgated correctly? Was that decree consistent with other elements of Spanish law? It was simply the fact that the decree conferred title to the sovereign that moved the court. So let me ask that because one of the things we talk about is does the purported act operate extraterritorially? So my question is, the 2017 bonds, where were they to be brought for the purpose of the exchange? I actually don't know the answer to that question, Your Honor. I don't think it matters for purposes of determining the sovereign act here. Let me push on that a little bit. If it turns out that the record tells us that the exchange that was the subject of the National Assembly resolution in 2017 was the presentation of bonds that matured in 2017 in New York City to exchange for 2020 notes that would themselves live in New York City, why isn't that an entirely extraterritorial transaction? I understand the question. I thought you were asking me solely about the 2017 bonds on their own terms. The exchange wasn't meant to be an exchange that contemplated acts in New York. We don't dispute that. The exchange wouldn't have involved contracts under New York law, payments under New York law. That's not in dispute. The legal question before the court, and this is controlled by the New York Court of Appeals definition of 8110 validity, is were the bonds or the securities valid when issued, or was there a defect by virtue of the National Assembly's lack of approval that rendered them invalid when issued? But they were issued here. The issuance occurred, the approval occurred in Caracas in Venezuela, and the lack of the National Assembly's approval authority, the lack of authority that provides the defect for the bonds, is entirely an issue of Venezuelan law. No one disputes that. And it is an entirely issue that occurred between governmental entities in Venezuela. How do we figure out the situs of the issuance? It's kind of an interesting question. Is it when the piece of paper that documents the bond is generated, that's the issuance, or when it's presented to someone else? It can't be that when somebody has the idea that they're going to issue bonds, it's being issued in the place where they had the idea. There's something that happens when you issue bonds. That may be true, but the defect present in the vehicle, and the defect that's present in the security is the absence of approval. Well, we're in a circle, though, right? If the absence of approval of the defect is a matter of Venezuelan law, that's a question that I think we're going to be talking about with your colleague. But if the defect purportedly arises as a result of an active state, then we have to ask the question, did that active state purport to operate extraterritorially? And that brings us to New York. And that's why I'm struggling with hearing from you first. So the instruction that is the instruction of the September resolution is an instruction that if it is effective, occurs entirely within Venezuela. The instruction of the September resolution is effectively, you may not issue this debt. It is an instruction to PDVSA. It is a command from the National Assembly that says, we reject your proposal for the refinancing of debt. You may not do so. If it is effective. It's effective because it occurs in Venezuela and it deprives PDVSA of the legal authority under Venezuelan law of moving forward with the transaction and issuing the debt and it means that the bonds were invalid when issued. I don't think it matters under the active state doctrine whether there is one component of that that might occur in New York. And the reason I don't think it matters is because in cases like, for example, Sabatino. Sabatino involved the expropriation of sugar that's sitting at the port outside of Cuba, but ultimately involved a dispute over payment between entities based in New York. And there was a dispute about whether one entity could repay another entity in funds that were being held by a receiver in New York state court. The fact that there is a spillover effect in the United States doesn't answer the question of whether the expropriation of sugar. The sugar was sitting in Cuba. That's right. What's sitting in Venezuela? What's sitting in Venezuela at the time of the national... What's this so-called sugar? What's sitting there is the authority to issue the debt. It's the legal authority to commit PDVSA to a repayment obligation. I guess I don't see the analysis. Well, it's because if there is a debt... If the sugar was sitting in New York in Sabatino, would you say, yeah, but the authority to sell the sugar was in Cuba? No, I... Would it come out the same way? No, I'm serious. What's the thing? The point is that it's an extraterritorial taking. There is no taking in this case. Or extraterritorial action. I guess I'm not following your analysis. Our argument is that there is no extraterritorial act or taking in this case. If the act is effective, it's effective because it occurred entirely within Venezuela, and what it did is it deprived PDVSA of the legal authority to move forward with authorization to engage in the transaction, and that is the precise question that is at issue under Section 8.1.10 of validity in this case. So I think we've worked through some of the... Do you have some further questions? I have... I just want to sort of... Back up. Bookkeeping, sort of, not bookkeeping, but I've read your 28-day letter about the consequences of the change in administration, but I just... I'm trying to understand. Has the new administration weighed in at all on Venezuela's position in this? There's been no weigh-in or change in position that the Republic has taken in this case.  And then the other question I had is, you know, through much of this litigation there was the U.S.-recognized Guaido-appointed PDVSA board, and then I understand there was sort of a parallel Maduro-appointed board. What's the status now? Does PDVSA have two boards, or does it have one board, and how... What does that look like? Well, for purpose of this case, basically there is one PDVSA, and it is represented by my colleague here, Mr. Team 5. There's been no change of any kind that has been put on the docket or is in the record of this case. You have... You have no... You have seen in some litigation motions to intervene or substitute parties. That has not occurred in this case, and so on the record before us the issue is simply not presented. Okay. All right. Why don't we turn to your colleague, and let's hear about some of the other ones, the Venezuelan law or whatever is within the ambit of your arguments. Thank you, Your Honor, and may it please the Court. As to Venezuelan law, the issue in this case is whether Article 150 of the Venezuelan Constitution categorically requires that the national executive be a party to a national public interest contract, and therefore excludes contracts by decentralized identities. The text and purpose of Article 150 preclude this interpretation, and the Venezuelan Court decisions, including Andre's philosophies, do not hold that wise. First, let's go to the text. Article 150 contains two requirements. The first sentence mandates national assembly approval for national public interest contracts where required by statute. The second sentence mandates such approval for contracts with foreign counterparties without the need for separate legislation. There is no dispute that for decades, the Venezuelan executive has submitted pursuant to Article 150's first sentence, and the national assembly has approved it. Joint venture contracts, including by community faith affiliates, where the national executive was not a party. The term national public interest contract must be read consistently for Article 150, and it cannot mean that contracts where the national executive is not a party qualify with the first sentence of that provision but not unto the second. Why doesn't the distinction that you just described support the opposite inference, that if the Constitution is going to purport to require national assembly approval for actions of entities that are part of a decentralized government, that needs to be reflected in statute. Otherwise, we're focusing on the second sentence, that's the central government. Why isn't that an equally plausible sort of inference from that contract that you set up? Your Honor, because the answer actually lies in Andres Velazquez, but also in the opinions of, in the comments of Venezuelan scholars, is the second sentence operates as a direct command. So if a national public interest contract, which can be done by a decentralized entity, is concluded with a foreign non-bipartisan counterparty, it has to go to the national assembly, irrespective of the separate legislation. So in Andres Velazquez, the court actually openly said, the financial public administration does not require submission of credit transactions to the national assembly. But the court in Andres Velazquez said, that law cannot insulate submission of such credit transaction contracts with foreign counterparties to the national assembly. That is a requirement that does not depend on independent legislation. It operates as a direct constitutional command. And that has been a historical feature of Venezuelan constitutional law since the early 20th century. The other point I would like to make is, it's also important to consider the purpose of Article 150. And limiting the term national public interest contract only to contracts by the national executive would eviscerate and contradict that purpose. Article 150 was expressly drafted in 1999 to counter a proposal by then-president Hugo Chavez, which sought to limit the scope of Article 150 and of the national assembly approval requirement to only contracts by the national executive. The constituent assembly rejected that proposal, and that is in the materials of the constituent assembly, which you can see in appendix 5225 through 5230. I'm sorry, could you just back up to Andres Velazquez? I'm still having trouble seeing how you get around that. So let me try to explain to Andres Velazquez. And focus on the language used. I don't want to hear big picture. You can use big picture, too. But big picture usually obscures what the board actually said. Focus on what they said. Because I sort of understood you to make a couple decisions. One, they didn't really say what the other side says they said. Even if they didn't say it, who cares? It's not really binding. The last one, I have to say, is not a particularly persuasive suggestion. But the first one, tell me why Andres Velazquez doesn't say what they say it says. So I think there are two points on that. One is, if you look at the primal discussion that the other side focused on, the district court did, and what Andres Velazquez discussed, what they were discussing, they were discussing in the primal discussion in the Venezuelan Constitutional Scholarship about the predecessor provision to Article 150, Article 126 of the 1986 Constitution. That provision used two different terms. It used the term national interest contract and national, state, or municipal public interest contract. And there was a lot of Venezuelan scholarship as to whether or not the term national interest contract and national public interest contract was the same or different. The constitutional chairman, Andres Velazquez, said that discussion has been resolved by the 1999 Constitution, which only uses the term national public interest contract. That discussion, that analysis, has nothing to do with the question whether Article 150 and the national public interest contract subject to Article 150 encompass or do not encompass decentralized state entities. And when the constitutional chairman, Andres Velazquez, said we will specify the meaning of the term national public interest contract, it explained that this is a contract whose purpose is determinant to essential to accomplishing the purpose and objectives for the Venezuelan state. This is at page 2117 in the appendix. That is the test of Andres Velazquez, and under that test, this contract qualifies because the potential loss of CITCO, which is a governmental asset of strategic importance in an industry where state ownership is constitutionally required in Venezuela, is certainly going to be determinant or essential to the Venezuelan state. You're saying strategic importance is, I guess I'm looking for what, that doesn't seem closely tied enough to what they're saying in Andres Velazquez. I mean, how do we determine what, when you're talking about national public interest, it's not the republic being a party to or a guarantor of whatever the transaction is. Now you're saying strategic importance? That doesn't, a lot of things could have strategic importance to the republic, and I don't know that that's, that seems too broad an interpretation of what the case is saying. I think you can look at the case as the constitutional terms of decision that was dated Andres Velazquez. Can I just stick with this one? No offense. Stick with this one, because, I mean, we deal with this kind of analysis, and I know it's not perfectly analogous. Look at what the Supreme Court said, and if we got a holding, we're stuck with it, right? Regardless of, well, we think the reason for it is this, the reason for the holding is that, but we can't extrapolate back to the reason and ignore the holding. So stick with, identify what you say is the holding here, and I get it, it's a civil law country, it's not exactly the same adjudication, but show us the money words, the money paragraph, where you think that they crystallized the rule that is embodied in Andres Velazquez, and tell us why that key paragraph doesn't mean what they say it means. Your Honor, the key holding is, and this is, again, I think on page 21, it's page appendix 2117, it's a rule I quoted where Chambers said, the national public interest contract is, I quote, is a contract, I quote, whose purpose is determinant or essential to accomplishing the purpose and objectives of an insolent state. And then continue saying, it's the contract. It's the purpose? That's the holding there? That's the limiting language? Is that a contract that has a purpose? This goes back to Judge Lee's question. I mean, that's a contract that anybody could have. You have somebody who's, I don't know, a very influential business in Caracas, and they are engaging in a contract that could have strategic value to the country because, say, they control some key natural resource. You wouldn't contend that because we extrapolate to this big picture that it has strategic value to Venezuela, it's covered by this, would you? No, of course not. So that's why I need the more specific language. A contract by a private insolent individual will not be national public interest contract. That's what I'm saying. You're extrapolating way too far into generality here. I did not mean to. I think the other requirement is that it has to be a contract concluded by a national state entity, whether by an entity of a national executive, such as a ministry, or an entity of a decentralized public administration, such as state-owned company or state autonomous institute. And this is why it's important to understand how the role that these decentralized entities play in the Venezuelan governmental structure. In the Venezuelan constitutional structure, decentralized, the national executive effectuates its policy, particularly in the contracting sphere through the decentralized entities. They are attached to a specific ministry. They act under the direction of the ministry. They are the ones that actually conclude entering into contracts. It is quite rare that the ministry will enter directly into a contract. And that's why Venezuelan constitutional scholars, as far back as in 1961, Professor Fares Matos said, if you exclude decentralized entities from the scope of Article 126, from the scope of a national public interest contract, you will allow the national executive to evade that requirement of a national assembly approval. I'm sorry, the rule of law. When we have specific rules of law, you can often evade them by doing something different, right? If the letter of the law says do A, but the letter lets you do B, and that evades the purpose or the spirit of A, usually the answer is tough luck. So, I guess I'm not seeing why allowing... If a process or a procedure is banned by, say, their constitution, but you can do some other process or procedure that gets you to the same endpoint, again, the answer is, who cares? I think the answer, Judge Algenius, here, the text of Article 150, when it refers to the national assembly's authority to approve national public interest contracts, that power is not limited to just contracts by the national executive. It also encompasses... I get that, but that's your endgame, right? That's the conclusion you wish us to draw, but you can't say that must be the conclusion because anything else would allow... If the constitution limits these sorts of contracts to ones that are signed by an actual executive department, then you don't get the result that the constitution probably wants. That seems to be the argument you're making, which is not a particularly persuasive one. I think you look at the purpose of that provision. Again, you're going back to purpose. You're going away from the text, the provision of what it says you can do and what Andres Velasquez says you can or can't do, as opposed to extrapolating out and saying, well, there's some bigger purpose here, so let's broaden that. Well, Your Honor, you can look at the text of Article 150. It does not say... It does not reference national executive. It references that the national assembly has the power to approve national public interest contracts. There is no limitation of those contracts to the national executive. And look at... Again, it's important to read Andres Velasquez, the Venezuelan constitutional scholar, in conjunction with constitutional chamber subsequent decisions. In a delta, a year later, and an attorney general to five years later. Can I... I do really want to talk about the subsequent. But I just... Here's my question about Andres Velasquez. I agree that the issue in that case had nothing to do with whether the decentralized public administration versus the centralized executive were subject to this. But the court did have this phrase, which was that contracts concluded by the republic through the competent organs of the national executive. That was the sort of limiting phrase. And that's been repeated in subsequent cases. We're not Venezuelan scholars, so we don't know with certainty whether that includes the decentralized public administration. But the district court put a lot of emphasis, and I think understandably so, on the fact that your own experts at a prior time were very critical of this decision precisely because they thought it purported to exclude from the scope of this requirement, the national public interest contract approval requirement, contracts for entities like PDVSA. If we think this decision... If we think, oh, it's compelling to criticize this decision on that basis, aren't we still stuck with your experts prior to understanding that that's in fact what this did? I think our experts, what they said is that they were concerned at the time that this decision could be misused to mean that an Andres Velazquez, the constitution, in fact restricted national public interest contracts in that way. And I think they were particularly concerned because at the time they were writing in 2015-17, the independence of the Supreme Judicial Tribunal was being eroded, and the judges were being replaced by the Maduro-appointed judges, many of whom the United States actually sanctioned. So I think they were concerned that that... But the Andres Velazquez decision was in 2000. It was in 2002, but I think some of the writings that our experts have where they criticized and said, well, this decision could be used to argue for restrictive interpretation, that was those writings came in 2007-18. And they were not alone. Other constitutional scholars, like Duke Corridor, also expressed a similar concern. Now, I do want to note there is a footnote in Professor Brewer's article from 2006 where he characterized that decision as binding. He then said that the use of the word binding was a mistake. It does not represent his views to win a decision of binding. But that's a separate issue from whether or not they believe that decision should have restrictive interpretation. And other scholars, for instance, at the appendix 1807, you can look at the opinion of Professor Bedell-Mandrid, which explains that, and this is one of the scholars this report actually quoted, he actually explained that if you look at Andres Velazquez, that decision is limited to the question of whether contracts by the national public, national executive entities, constitute national public interest contracts, because that was the only issue before that court. And to the extent this court thinks there is some ambiguity because we're dealing with a foreign system, these courts sometimes reason a different way than a common law court, you can look at the opinion of the Republic, which took the similar position and explained that the issue of whether or not Article 150 excluded decentralized entities was not an issue in Andres Velazquez. And then the Republic pointed to the subsequent decision in Delft and said, look, in the Delft, the constitutional chamber explained that what's important is that the subject matter of a contract relates directly to the national interest. That is what happened then in the Delft, where the constitutional chamber in fact said that the contract entered into by a state-owned Venezuelan company for the provision of a supply of electricity is a national public interest contract. Wasn't that contract the consummation of an executive convention about provision of, I mean, can we understand that apart from that context where the Republic at the highest levels was in fact involved? Your Honor, I think it was certainly connected to the agreement between the Venezuelan and the Brazil for the construction of a power line in a particular region. But what the constitutional chamber emphasized was that the contract between Adelka, the state-owned company and the Brazilian company was a separate contract subject to a separate legal regime. It did effectuate the interests which were embodied in the international agreement, but I would argue that actually the Republic's interest in keeping control of the system is more consequential than the interest in ensuring that there is electricity supply to an electric line between Venezuela and Brazil. This Court can also look at the Attorney General's decision, which was issued five years after Andres Velazquez, and there the constitutional chamber said that a contract by a state-owned agricultural bank is a national public interest contract. The district court said... But the subject of that contract was to commit not just the bank but the Republic itself to indebtedness, right? So again, it's sort of nominally conducted by a state-owned enterprise, but the consequence is to bind the Republic itself in a way that I think distinguishes something that's the state-owned enterprise acting as a private entity, essentially. Yolanda, I agree, but I think it shows that participation of a national executive as a party is not a categorical requirement for something to be a national public interest contract. And certainly, in Attorney General, the Republic made itself liable for any kind of debt that was not paid by that agricultural bank. But by the same extension, in this case, the Republic will lose control of a $16 billion company, which is of strategic importance for its own lenders. But it's not liable, right? It can't reach beyond PDVSA to sue Venezuela for its sovereign assets in satisfaction of its bonds, right? It's a normatively different... Yolanda, that is correct. I think, again, that's when you have to look at what role PDVSA and similar companies of a decentralized public administration play in Venezuela. And there is no strict line separating the national executive in Venezuela from companies like PDVSA, which is a state-owned company. It's actually referenced in the Constitution, which mandates Venezuelan state ownership of PDVSA. So, this PDVSA is, in fact, a part, it's unquestionably a part, of the national public administration in Venezuela. And the loss of... the loss of Circo, which is owned by PDVSA, or any kind of other PDVSA assets which may be attached, will be a direct loss to the Republic. In the Venezuelan constitutional structure, it is still viewed as directly tied to the national state interest. Okay. I think that we have asked you quite a few questions. We've kept you up. Are there any other questions the panel has right now? Okay. We will see you back for rebuttal. Don't go away. We have Attorney Hansford for the appellate. Good morning, and may it please the Court. Masha Hansford of Davis Polk for appellate, the collateral agent, and the trustee. The district court's thorough analysis of Venezuelan law has overwhelming support in multiple decisions of Venezuela's high constitutional court in the views of scholars of Venezuelan law, including PDVSA's own experts in this case, and their own prior scholarship, and an extensive body of past practice. The constitutional chamber's binding interpretation of the term national public interest contract in Andres Velazquez establishes, in the language that Judge Robinson referenced in my friend's argument, that the national executive itself must, rather than the state-owned company, must be a party. Well, because you're confident in organs, right? And so that's sort of where the ambiguity comes in. And one of the things I'm struggling with, and again, this is not being a Venezuelan lawyer, is there was nothing in that case that implicated the issue that's before us here, right? It was challenging the constitutionality of the statute that purported to let the national executive himself enter into these extra, you know, these transactions. Isn't the choice of language, then, a little bit like what we might call dicta within our own system? It's the terminology they use, but nobody was asking them to consider the question of how broad the universe is of actors that are subjects of Article 150. Judge Robinson, two responses to that. The first is, I think the concept of holding in dicta doesn't map on perfectly to the Venezuelan system, because under Article 335 of the Venezuelan constitution, the constitutional chamber has supreme authority over interpretations of the constitution, and this unequivocally is an interpretation of the constitution. If there was any doubt about that, it actually invokes the language of Article 335. It says, proceeding as maximum and ultimate interpreter of the constitution. This is on page 2116 of the appendix. It says, as maximum and ultimate interpreter of the constitution, the court chooses to set a comprehensive definition. So I do think it's binding for that reason. Even if you want to think about it in the more familiar terms of holding in dicta, you're right that this particular distinction was not an issue in Andres' last case, and the court could have decided the case more narrowly, but it chose not to do that. Instead, it chose, it said, the term national public interest contract has been confused. We are choosing to set out a broad rule, and set out a broad rule doesn't apply to a lot of situations, and then applied it to this case. Even in the U.S. system, I think that would be the racial dissidenty that would be binding if the U.S. Supreme Court did the same thing. So if we're trying to decide whether PEDAVASA is a competent organ of the national executive, if that's sort of what this turns out, we consider ourselves to be bound by both that case and this particular language. Given the extensive interconnection between PEDAVASA and a state-owned enterprise,          why isn't it reasonable to understand PEDAVASA, especially given the significance of its conduct to the well-being of the nation and the whole purpose of this doctrine, to understand it to be a competent organ of the national executive? Judge Robinson, under the Venezuelan Constitution, it is very clear that state-owned entities, like PEDAVASA, are not organs of the national executive. They are completely distinct concepts. Now, they are very important to the Republic, and I'd like to address how national laws address that, but just to point you to the constitutional provisions that make that clear. Article 225 of the Constitution makes it clear that the national executive is the president, the vice president, and the cabinet ministers. That's Title V of the Constitution. The decentralized state-owned entities are governed by Article VI of the Constitution, a whole different article. They have a different regime, different appointments, different powers, so they're very important. They're specifically provided for in the Constitution, but they're entirely distinct, and I haven't really heard PEDAVASA make the argument that this is itself the national executive, as opposed to a decentralized entity. What I've heard it doing primarily is just denying that first part of the Andrei Solovkin rule, not reading it out, the language on page 2116 about it needing to be an organ of the national executive and just going straight to the second requirement that it be important. But to address the thrust of your question of this is really important, why shouldn't National Assembly be required? I think the key point there is that Article 150 is a constitutional floor. It applies to this particular category of contracts that is entered into by the national executive. It's a kind of separation of power provision. But the National Assembly is fully empowered to require its own approval in additional cases. The power comes from Article 187, Section 1, that allows the National Assembly to legislate on matters of national importance. And it has done so. And this is a really important part that I think Pedevesa's presentation has allied in. Organic Law 98 actually requires the approval of the National Assembly for contracts of the republic and other entities that would cover the central bank and decentralized entities. It specifically refers to  entities. But then Article 101 exempts the central bank and it exempts Pedevesa. That's Article 1014. Under Pedevesa's  that law would be unconstitutional and that is a really strange result. Instead, what happened here, and I think it's understandable, and the bridge across the decision helps explain this, requiring National Assembly approval is a very unreal requirement. In a time of divided government, you might not be able to enter essential financing transactions. So to make it more nimble, you might not want that requirement. There are many other checks, laws governing what kind of agreements Pedevesa can enter, or has to approve them and the like. But the requirement for National Assembly approval is not one that National Assembly itself has chosen to  So they're trying to have this very broad meaning of Article 150 that is contrary to what the court said in Andres Velasquez and I think it's contrary, and this is really significant, to 40 years of on-the-ground practice in Venezuela. There's not a single debt financing transaction, as you pointed out, Judge Robinson, by Pedevesa, that changed National Assembly approval. Are there any in which majority stake in CITGO was pledged? There was actually a transaction in 2003 that was secured by an interest in CITGO, and there was a transaction with Rosneft that pledged a 49.9% stake in  Can you give me those sites? If not, that's okay, I'll find them. I can get you those sites. But I do think the kind of rule that they're positing is to be a National public interest contract, it requires the participation of the national executive unless it's a pledge for a majority interest in CITGO. That rule just goes to the importance and not to the participation of whom. I think all these transactions, many of which were very important. You don't dispute that there are some state enterprises that do enter into national public interest contracts pursuant to the first sentence of article 150, is that right?